[No. 2909. Sept. 4, 1925. Rehearing Denied April 12, 1926.]

## FARMERS' STATE BANK OF TEXHOMA, OKLA., v. CLAYTON NAT. BANK (WOLFORD, Intervener.)

[245 Pac. 543.]

### SYLLABUS BY THE COURT.

1. There was a distinction in the law merchant between instruments declared void by statute and those the consideration for which was illegal. The latter were, and the former were not, enforceable in the hands of a holder in due course.

2. Looking to the law merchant for the definition of "illegal consideration," in section 55, Uniform Negotiable Instruments Law (section 549, Code of 1915), there is no repugnancy between that section and section 2510, Code of 1915, declaring void bills, notes, etc., when the consideration is money or property won at gambling.

3. Sections 52, 55, 57, and 59, Uniform Negotiable Instruments Law, merely declaratory of law merchant theretofore in effect in this state and not intended to modify gaming law so as to allow enforcement by holder in due course of note or bill won at gambling. Wolford v. Martinez, 28 N. M. 622, 216 P. 499, overruled.

4. In a suit, under section 2510, Code of 1915, to cancel a draft, the consideration for which was money money won at gambling, **held** on appeal that, by the adoption of Uniform Negotiable Instruments Act, the gambling act was so modified that such an instrument theretofore void, was en-

---

[1] 8CJ p. 244 n. 28 New; p. 767 n. 17; p. 768 n. 26. [2] 8CJ p. 496 n .79. [3] 8CJ p. 769 n. 27; p. 770 n. 39, 40: 27CJ p. 1072 n. 83. [4] 4CJ p. 1093 n. 77; p. 1099 n .8

forcible in the hands of a holder in due course. This decision not "the law of the case" on appeal of another case by the holder in due course to recover on said draft from the drawer, in which case the plaintiff in the former case intervened as a party defendant, claiming to be the sole party adversely interestde.

Appeal from District Court, Union County; Leib, Judge.

Action by the Farmers' State Bank of Texhoma, Okla., against the Clayton National Bank, to recover on a draft, in which Jabe Wolford intervened. Judgment for plaintiff, and the defendant and intervener appeal. Reversed, and remanded with directions.

Joseph Gill, of Albuquerque, for appellants.

O. T. Toombs, of Clayton, for appellee.

### OPINION OF THE COURT.

WATSON, J. The complaint in this case was filed January 7, 1921, alleging the purchase and ownership in due course by the plaintiff, the Farmers' State Bank of Texhoma, of a certain draft issued by the defendant, Clayton National Bank, upon the First National Bank of Denver, for the sum of $500, payable to one J. B. Martinez, and indorsed by the said Martinez, and also by Mrs. R. M. Campbell and J. J. Myers. It also alleged that said draft had been by the plaintiff presented to the defendant for payment, and such payment refused, and that thereafter the same was presented to the drawee, the First National Bank of Denver, and payment thereof refused, and the same protested. It also alleged that suit had been commenced in the same court by one Jabe Wolford for the cancellation of said draft. January 8, 1921, an answer was filed by the Clayton bank admitting that the draft in question had been presented to and paid by the Texhoma Bank in due course of business. The answer alleged that the draft in question was void, for the reason that it was given as a part of the stakes in a gambling game. On April 25, 1921, the Texhoma bank filed its reply denying the new matter. Meanwhile, on April 15, 1921, said Wolford had filed his amended complaint in his suit

346          SUPREME COURT OF NEW MEXICO

Fmrs.' S. Bank of Texhoma, v. Clayton N. Bk., 31 N. M. 344

for the cancellation of said draft, the allegations of which are sufficiently set forth in our opinion of the appeal of that case (Wolford v. Martinez et al., 28 N. M. 622, 216 P. 499). No further proceedings were had in the case at bar until after the decision by this court of the suit for cancellation, May 29, 1923, rehearing in which was denied June 25, 1923. On September 17, 1923, the said Jabe Wolford, plaintiff in the other case, filed a petition for intervention in this case, setting forth, in substance, the same facts alleged by him in his complaint in the other case, and also alleging that defendant, Clayton National Bank, had no interest in the subject-matter of the litigation, except as a depository holder of moneys pending the decision of the court. September 19, 1923, the Texhoma bank replied, denying the facts and questioning their sufficiency as matter of law. On September 20 1923, plaintiff, Texhoma bank, moved for judgment on the pleadings, which was denied. The cause proceeded to trial September 21, 1923, and judgment in favor of plaintiff, the Texhoma bank, was entered on September 25, 1923.

We have set forth the proceedings in these two cases with such particularity in order to show their interrelation, the importance of which will appear later. As appears from our former opinion the lower court, in the cancellation case, took the view that the allegations of the complaint were sufficient to show that the Texhoma bank was the legal holder and owner of the draft in due course, for which reason he sustained a demurrer to the complaint and entered judgment for the defendant, Texhoma bank. We reversed this judgment, and held that the facts alleged in the complaint showed that J. W. Campbell, who won the draft from the appelland Wolford, held a defective title thereto because of the provisions of the gaming law of this state (sections 2507 and 2510, Code of 1915), and that under section 651, Code of 1915, a holder in due course of such an instrument holds it free from defects of title of prior parties, and free from any defenses available to prior parties among themselves; but that under section 653,

JANUARY TERM, 1926        347

Fmrs.' S. Bank of Texhoma, v. Clayton N. Bk., 31 N. M. 344

Code of 1915, the defective title of the prior holder having been shown, the burden rested on defendant, the Texhoma bank, to show that it was a holder in due course, it being our theory that the provisions of the gaming law making such an instrument void were modified by the subsequent provisions of the Negotiable Instruments Law.

In the case at bar, the lower court found, as requested by the defendant and the intervener, that the intervener Wolford purchased the draft in question from the defendant Clayton National Bank, and paid for the said draft and owned it, and on the same day put it up as stakes in a gambling game and lost it to said J. W. Campbell. He found also that plaintiff, Texhoma bank, had become the owner of said draft in due course of business, and, applying the law as announced in our former decision, rendered judgment in favor of the Texhoma bank.

Section 2510, Code of 1915, above referred to, is a part of an act relating to gambling, enacted in 1857, and reads as follows:

"All judgments, securities, bonds, bills, notes or conveyances, when the consideration is money or property won at gambling, or at any game or gambling device, shall be void, and may be set aside or vacated by any court of equity upon a bill filed for that purpose, by the person so granting, giving, entering into, or executing the same or by any creditor or by his executors, administrators, or by any heir, purchaser, or other persons interested therein."

The sections of the Negotiable Instruments Act, passed in 1907, above referred to, are as follows:

"Sec. 646. A holder in due course is a holder who has taken the instrument under the following conditions:

"I. That it is complete and regular upon its face;

"II. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"III. That he took it in good faith and for value;

"IV. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." Section 52, U. N. I. Act.

348    SUPREME COURT OF NEW·MEXICO

Fmrs.' S. Bank of Texhoma, v. Clayton N. Bk., 31 N. M. 344

"Sec. 649. The title of a person who negotiates an instrument is defective within the meaning of this chapter when, he obtained the instrument, or any signature thereto, by fraud, duress or force and fear or other unlawful means, or for an illegal consideration or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud." Section 55, U. N. I. Act.

"Sec. 651. A holder in due course holds the instrument free from any defect of title or prior parties, and free from defense available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof againt all parties liable thereon." Section 57, U. N. I. Act.

"Sec. 653. Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course. But the last-mentioned rule does not apply in favor of a party who became bound on the instrument prior to the acquisition of such defective title." Section 59, U. N. I. Act.

The question involved is whether one who in  due course obtains title to a negotiable instrument, the consideration of which is money won at gambling, holds it free from defenses. This question we answered affirmatively in our former opinion, but appellants vigorously urge that we were wrong in so holding.

It appears that in five states having gaming laws similar to ours, the question has arisen whether the subsequent adoption of the Negotiable Instruments Act has modified them. Alexander v. Hazelrigg, 123 Ky. 677, 97 S. W. 353; Levy v. Doerhoefer's Ex'r, 188 Ky. 413, 222 S. W. 515, 11 A. L. R. 207; Martin v. Hess, 23 Pa. Dist. R. 195; Twentieth Street Bank v. Jacobs, 74 W. Va. 525, 82 S. E. 320, Ann. Cas. 1917D, 695; Plank v. Swift, 187 Iowa 293, 174 N. W. 236, 8 A. L. R. 309; Larschen v. Lantzes, 115 Misc. Rep. 616, 189 N. Y. S. 137. In all of these cases the decision has been contrary to ours. Reviewing them, the author of the note (8 A. L. R. 314), says:

"The majority of the cases which have passed directly on the question hold that a statute invalidating negotiable instruments given for a gambling consideration is not repealed by the adoption of the Uniform Negotiable Instruments Act, which contains a provision to the effect that a holder in due course holds the instrument free from any defect of title of

JANUARY TERM, 1926                349

Fmrs.' S. Bank of Texhoma, v. Clayton N. Bk., 31 N. M. 344

prior parties and free from defenses available to prior parties among themselves."

In a later note (11 A. L. R. 211), at the foot of Levy v. Doerhoefer's Ex'r, supra, the author says:

"The reported case is apparently the only recent decision which considers the effect of the Negotiable Instrument Act on a statute making invalid an instrument given for a gambing consideration."

In 8 C. J. 768, title "Bills and Notes," it is said:

"If the instrument or contract is declared 'void' by statute it cannot be enforced even by a bona fide holder, and this is so even in those states where the Negotiable Instruments Law has been enacted."

And in 27 C. J. 1072, title "Gaming," it is said:

"Although there is some authority tending to the contrary, the weight of authority favors the rule that, in the absence of express provision, the Negotiable Instruments Law does not repeal or modify the statutes rendering void negotiable instruments given for a gambling consideration and in the hands of bona fide holders."

The authority cited to the contrary in the last quotation is Wirt v. Stubblefield, 17 App. D. C. 283. That decision places stress upon the general object of the act to obtain uniformity of law and decision, which purpose that court thinks would not be effected "so long as the instrument was rendered absolutely null and void by local statute." However, as we understand, in that jurisdiction there existed no gaming law similar to ours, but only the English statutes (16 Car. 2 and 9 Anne), considered a part of their common law.

In other cases, the courts have considered statutes relating to usury, "peddler's note," notes stipulating for attorney's fees, and perhaps other subjects, and it appears that it is almost unanimously held that if the statute declares such instruments void, they are no less so since the adoption of the Uniform Negotiable Instruments Act. Professor Brannon, in his work, "The Negotiable Instruments Law," p. 186, after considering these decisions, says:

"It is submitted that the weight of authority and the better reasoning is in favor of the view that the Negotiable Instru-

350    SUPREME COURT OF NEW MEXICO

Fmrs.' S. Bank of Texhoma, v. Clayton N. Bk., 31 N. M. 344

ments Law does not impliedly repeal statutes which express-
ly or by necessary implication declare an instrument void."

Reviewing these decisions holding contrary to ours, we conclude that the courts rendering them were influenced mainly by the view that the Legislature, in passing an act relating to negotiable instruments, could not be presumed to have intended to modify the established legislative policy as to gaming. Generally speaking, they applied the rules of construction that repeals by implication are not favored, and that a later enactment of general scope will not be held to modify a former enactment whose scope is special. We find these rules of construction frequently referred to in our own decisions. Territory v. Digneo, 15 N. M. 157, 103 P. 975; U. S. v. Meyers, 14 N. M. 522, 99 P. 336; Territory v. Riggle, 16 N. M. 713, 120 P. 318; Ex parte De Vore, 18 N. M. 246, 136 P. 47; Smith v. City of Raton, 18 N. M. 613, 140 P. 109; State ex rel. County Commissioners v. Romero, 19 N. M. 1, 140 P. 1069; State v. Coppinger, 21 N.M. 435, 155 P. 732; James v. County Commissioners, 24 N. M. 509, 174 P. 1001; State ex rel. Walker v. Bridges, 27 N. M. 169, 199 P. 370; State v. Davisson, 28 N. M. 653, 217 P. 240. But rules of construction are resorted to merely as aids in determining the true legislative intent. No such rule is of any force when the legislative intent is plain. In this jurisdiction, the rule that a later enactment of general scope will not affect a former specific enactment has been disregarded where the court was otherwise satisfied of the legislative intent. State ex rel. County Commissioners v. Romero, supra; State ex rel. Walker v. Bridges, supra. See, also, U. S. v. Meyers, supra.

But any contention that the gaming law has been modified by the Negotiable Instruments Act must be based upon some conflict in their provisions. Wherein is the repugnancy?

[2] Section 55 of the Negotiable Instruments Act (section 649, Code of 1915), provides:

"The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument * * for an illegal consideration. * * *"

JANUARY TERM, 1926     351

Fmrs.' S. Bank of Texhoma, v. Clayton N. Bk., 31 N. M. 344

[1] The consideration of an instrument won at gambling may, of course, be said to be "illegal," but that is not all. The instrument itself is void. Prior to the adoption of the Negotiable Instruments Act, there was a well-recognized distinction between an instrument whose consideration was illegal and one by statute expressly declared void. Union Trust Co. v. Preston National Bank, 136 Mich. 460, 99 N. W. 399, 112 Am. St. Rep. 370, 4 Ann. Cas. 347. And it was the generally accepted doctrine that instruments, whose consideration was illegal, were enforceable in the hands of the holder in due course, while an instrument by statute expressly declared void was not so enforceable. See Lynchburg National Bank v. Scott Bros. 91 Va. 652, 22 S. E. 487, 29 L. R. A. 827, 50 Am. St. Rep. 860, quoting from Daniel on Negotiable Instruments, Story on Promissory Notes, Kent's Commentaries, and a number of decided cases. See, also, Union Trust Co. v. Preston National Bank, supra, and note appended thereto; 4 Ann. Cas. 353; Daniel on Negotiable Instruments (6th Ed.) § 197; Ogden on Negotiable Instruments, § 130 et seq.; Note Ann. Cas. 1917D, 696. For the definition of the terms employed in the Uniform Negotiable Instruments Act, we look, of course, to the law merchant, universally recognized as part of our common law, and we thus find that the supposed repugnancy does not exist.

[3] This directs attention to another situation. The adoption of the Uniform Negotiable Instruments Act introduced no new system. Generally speaking, and particularly as to the sections under consideration, it is merely declaratory of the existing law merchant or common law. Prior to 1907, when we adopted it, a very few sections embodied all of our statute law of negotiable instruments. Our law was the common law, which we adopted in 1876, as the rule of practice and decision. Section 1354, Code of 1915. Giving the term "illegal consideration" the interpretation placed upon it at the common law, no change took place in the law of this state when we adopted sections 55 and 57 of the

352     SUPREME COURT OF NEW MEXICO

Fmrs.' S. Bank of Texhoma, v. Clayton N. Bk., 31 N. M. 344

Negotiable Instruments Law. If the Legislature did not change, nor intend to change even the law of negotiable instruments, it, of course, did not intend to change the gaming law.

The repealing clause of the Uniform Negotiable Instruments Act, as adopted in this state (section 197, c. 83, Laws of 1907), is as follows:

"All acts and parts of acts in conflict herewith and all acts relative to negotiable instruments are hereby repealed, and this act shall be in force and effect from and after its passage."

Counsel for appellee calls attention to the fact that the words "and all acts relative to negotiable instruments" do not appear in the repealer of any of the four states which have directly passed upon the question. But we do not think this distinction can affect the decision. The act of 1857 is not an act relative to negotiable instruments. It is relative to gaming. Its effects on negotiable instruments are incidental to the main purpose to suppress gaming. There were in our books at the time the act approved January 8, 1852 (Laws 1851-52, p. 283) entitled "An act authorizing the assignment of notes, bills and other instruments in writing, and for other purposes," the four sections of which were compiled in the Code of 1915 as sections 589-592, and two of the three sections "an act realting to days of grace and protest of commercial paper," chapter 30, Laws of 1876, Code of 1915, as sections 593, 594. Whether a repeal of these sections was effected or intended we need not consider. However, they, much more than the gaming law, answer the description "acts relative to negotiable instruments." Considering the immediately preceding section (196), "In any case not provided for in this act the rules of the law merchant shall govern," the title, "A general act relating to negotiable instruments, being an act to establish a law uniform with the laws of other states on that subject," and the well-known history of the work to promote uniformity of the law of commercial paper, we readily agree that the broad object of uniformity should be given effect by the courts where it can be

done without violence to legislative intent. Yet we cannot hold that, by the adoption of sections merely declaratory of existing law as to negotiable instruments in general, it was intended to breathe life into a void gambling instrument. These considerations constrain us to hold that our former decision was wrong, and should be overruled.

[4] Here another question arises. The case at bar is substantially the same case as that in which our erroneous decision was rendered. The subject-matter is the same—the void draft. The parties with respect to their beneficial interest are the same—the Texhoma bank on one side and Wolford on the other. The same legal proposition is involved. The facts are the same. Both were commenced at about the same time, the present case having lain dormant while the ruling of this court was obtained in the other, since which time the other has apparently lain dormant until this cause could be tried in the lower court and brought here in the effort to obtain a contrary ruling. It is unquestionably the generally accepted doctrine that the law applied on the first appeal of a case is binding on the second appeal. This doctrine, "the law of the case," has been many times applied in this jurisdiction. Ruppe v. N. M. Lbr. Co. 3 N. M. 555, 9 P. 301; Crary v. Field, 10 N. M. 257, 61 P. 118; Flournoy v. Bullock, 11 N. M. 87, 66 P. 547, 55 L. R. A. 745; U. S. v. Denver & Rio Grande R. R. Co., 11 N. M. 145, 66 P. 550; Armijo v. Mountain Elec. Co., 11 N. M. 235, 67 P. 726; Dye v. Crary, 13 N. M. 439, 85 P. 1038, 9 L. R. A. (N. S.) 1136; Palma v. Weinman, 15 N. M. 68, 103 P. 782; Cowles v. Hagerman, 15 N. M. 600, 110 P. 843; A. & C. R. R. Co. v. D. & R. G. R. R. Co., 16 N. M. 281, 117 P. 730; State ex rel. Garcia v. Board of County Commissioners, 22 N. M. 562, 166 P. 906, 1 A. L. R. 720; Romero v. Herrera, 30 N. M. 139, 228 P. 604; McBee v. O'Connell, 19 N. M. 565, 145 P. 123; Davisson v. Bank, 16 N. M. 689, 120 P. 304; First National Bank v. Cavin, 28 N. M. 468, 214 P. 325. In a number of these cases, the court refused to review the former decision, although counsel were strongly con-

tending that it was erroneous. Dye v. Crary, supra; Davisson v. Bank, supra; First National Bank v. Cavin, supra. It has also been said that the rule applies not only to questions specifically decided, but also to those necessarily involved. U. S. v. D. & R. G. R. R. Co., supra. And said, also, that it applies not only to questions raised upon the former appeal, but to those questions which could have been so raised. State ex rel. Garcia v. Board of Commissioners, supra; Davisson v. Bank, supra.

Under our former decisions, we do not think we could properly hold that the question under consideration was not involved in our former ruling, so that the doctrine of "the law of the case" would not apply. We do find, however, that the present case is distinguishable in two respects from the vast majority of the reported cases bearing upon this doctrine, and from any case decided in this jurisdiction. First, it has never been applied in this state in a case where, admittedly, the former holding was wrong; and, second, it has never been applied in this state except on a second appeal of the same case.

In considering the effect of the first distinction above mentioned, we are met with the situation that while this court, when it has applied the doctrine, has never conceded the error of the former holding, it has several times announced that the rule is to be applied whether the former holding was right or wrong. U. S. v. D. & R. G. R. R. Co., supra; Davisson v. Bank, supra; Dye v. Crary, supra; First National Bank v. Cavin, supra. It would seem that the statement of the doctrine, as a rule binding the courts, would presuppose error in the former holding. However, it is pointed out in the note "Erroneous decision as law of the case on second appeal" (1 A. L. R. 1267):

"While many courts have insisted and still insist that the doctrine or principal of 'the law of the case' is good law, and should be applied in all cases, there has been a considerable tendency, and probably a growing one, to make an exception, where it clearly appears that the former decision was erroneous; and, as a consequence, there is re-

JANUARY TERM, 1926        355

Fmrs.' S. Bank of Texhoma, v. Clayton N. Bk., 31 N. M. 344

spectable authority to the effect that a decision rendered
on one appeal, if clearly erroneous, is not conclusive up-
on the court upon a subsequent appeal of the same case."

Considering the second of the distinctions above
pointed out, we find that while the vast majority of
the cases in which the doctrine has been applied are
second appeals in the same case, it has been applied by
some courts in cases technically distinct from that in
which the former ruling was pronounced.    Tally v.
Ganahl, 151 Cal. 418, 90 P. 1049; Portland Trust Co. v.
Coulter, 23 Or. 131, 31 P. 280; Hawley v. Smith, 45 Ind.
183; Wilkes v. Davies, 8 Wash. 112, 35 P. 611, 23 L. R.
A. 103.

The doctrine of the law of the case is not a rule to
which we are bound by any legislative enactment.    In
so far as we are bound, it is because we have so bound
ourselves, or choose so to bind ourselves by our deci-
sions.    By those courts which refuse, under some cir-
cumstances, to be bound by it, it is pointed out that
when we conclude that a former decision is erroneous,
and we still have the opportunity to correct it as affect-
ing those parties whose interests are concerned in the
original ruling, we should apply the law of the land
rather than the law of the case. On the other hand, those
courts, holding to the doctrine in all its vigor, point
out that, while we may refuse to follow the erroneous
decision in other cases and as affecting other parties,
we may not refuse to follow it in the same case, because
the parties have had their day in court, and the ques-
tion is as to them res judicata, and because, without
this rule, there would be no end of litigation, and the
court would be subject to repeated criticism of and
objection to its former pronouncements, and that every
change in the personnel of the court would produce
confusion.    Being at liberty to apply the doctrine to
such extent as sound judicial policy shall seem to re-
quire, we have concluded that we need not, and ought
not, go further than our own decisions have already
gone.    As stated, we have never applied the doctrine
except to a second appeal.    While the two cases, which
we are considering, are so interrelated that it is diffi-

356        SUPREME COURT OF NEW MEXICO

Fmrs.' S. Bank of Texhoma, v. Clayton N. Bk., 31 N. M. 344

cult to think of them otherwise than as the same case, still they are not technically such. Such a situation as this is not often likely to arise in our courts. Our search for precedents satisfies us that such a situation has not often arisen in other courts. We therefore feel that we are not endangering the orderly and expeditious · administration of the law by refusing here to apply the doctrine of the law of the case. On the other hand, we feel that it is better and more just to apply in this case what we find to be the law of the land. As affects the parties concerned, the evil effects of so doing are trivial as compared to the unfortunate consequences of perpetuating the error.

It is perhaps proper to remark that the learned trial judge was unquestionably justified, and that it was his duty in the trial and decision of this case to apply the law as expounded in our former decision. In that sense, he committed no error. The judgment being erroneous, however, under our conclusions, will be reversed, and since the trial court made findings of fact from which it follows that the suit is based upon a void instrument, upon which no recovery can be had, even by a holder in due course, the case will be remanded, with direction to enter judgment for the defendant, and

It is so ordered.

PARKER, C. J., and BICKLEY, J., concur.